**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| LAUREN WILLIAMS, derivatively on behalf of CORCEPT THERAPEUTICS INCORPORATED., <br><br> Plaintiff, <br><br> v. <br><br> G. LEONARD BAKER, JOSEPH K. BELANOFF, DANIEL M. BRADBURY, RENEÉ D. GALÁ, DAVID L. MAHONEY, CHARLES ROBB, DANIEL N. SWISHER, and JAMES N. WILSON, <br><br> Defendants, <br><br> -and- <br><br> CORCEPT THERAPEUTICS INCORPORATED, <br><br> Nominal Defendant. | Civil Action No.: _____ <br><br><br><br> **DEMAND FOR JURY TRIAL** |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff Lauren Williams ("Plaintiff"), by and through her undersigned counsel, derivatively on behalf of nominal defendant Corcept Therapeutics Incorporated ("Corcept" or the "Company"), submits this Verified Stockholder Derivative Complaint against the Individual Defendants (defined herein) as officers and/or directors of Corcept for breaches of fiduciary duty, insider selling and misappropriation of information, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff bases her allegations on personal knowledge as to her own acts, and on information and belief as to all other allegations, based upon investigation by counsel, including, but not limited to, a review and

analysis of:  (i) regulatory filings made by Corcept with the United States Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Corcept; (iii) a securities class action lawsuit filed in the United Stated District Court for the Northern District of California against Corcept and defendants Joseph K. Belanoff ("Belanoff") and Charles Robb ("Robb"), captioned *Melucci v. Corcept Therapeutics Incorporated.*, Case 5:19-cv-01372 (N.D. Cal.) (the "Securities Class Action"), alleging violations of the federal securities laws based on similar facts and circumstances as alleged herein; and (iv) other publicly-available information, including media and analyst reports, concerning Corcept.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a stockholder derivative action that seeks to remedy wrongdoing committed by certain of Corcept's officers and members of the Company's Board of Directors (the "Board"). Plaintiff seeks to remedy the Individual Defendants' violations of state and federal laws from August 2, 2017 through February 5, 2019 (the "Relevant Period") that have caused and continue to cause substantial monetary damages to Corcept and other damages.

2.     Corcept is a pharmaceutical company founded in Silicon Valley that focuses on adverse effects of excess cortisol.  Cortisol is a hormone produced by the body's adrenal glands and helps with various functions (*e.g.*, processing carbohydrates, fats, and proteins, regulating blood pressure, moderating the sleep cycle).  But too much cortisol can cause anxiety, depression, headaches, heart disease, digestion problems, sleep trouble, and weight gain; and long-term exposure to excess cortisol can lead to a disorder called Cushing's syndrome.

3.     In 2012, Corcept launched the prescription medicine Korlym, a cortisol receptor blocker, which was the first FDA-approved oral therapy for the treatment of Cushing's syndrome. During the Relevant Period, Korlym was Corcept's only commercialized product.  As the

Company stated in its full-year report for fiscal year 2018, filed with the SEC on February 26, 2019 on a Form 10-K (The "2018 10-K"), "Our ability to generate revenue and fund our commercial operations and development programs is entirely dependent on the sale of Korlym to treat patients with Cushing's syndrome."

4.      Between August 2, 2017 and November 2, 2017, Corcept filed several quarterly reports and an annual report with the SEC, but the Company failed to disclose that it had improperly promoted Korlym by encouraging doctors to prescribe Korlym for off-label uses and that it was paying the doctors using its speakers bureau program.  Additionally, Corcept concealed the fact that a specialty pharmacy responsible for 99% of the Company's revenue was a related party that aligned itself with Corcept's illicit sales practices.

5.      Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors that:  (1) the Company had improperly paid doctors to promote Korlym; (2) the Company aggressively promoted Korlym for off-label uses; (3) the Company's sole specialty pharmacy that was responsible for 99% of the Company's revenue was a related party; (4) the Company artificially inflated its revenue and sales using illicit sales practices through a related party; (5) such practices are reasonably likely to lead to regulatory scrutiny; and (6) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

6.      Finally, on April 24, 2018, certain of the Individual Defendants negligently issued a materially false and misleading Proxy Statement (the "2018 Proxy") urging stockholders to reelect certain directors under false pretenses.

7.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other misconduct, Corcept has sustained damages as described below.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b), 14(a), and 20(a) of the Exchange Act (15 U.S.C. § 78n), and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder.

9.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

10.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

12.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because nominal defendant Corcept is incorporated in this District.  In addition, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

13.     Plaintiff is a current holder of Corcept common stock and has held Corcept common stock continuously since August 2017.

14.     Nominal Defendant Corcept is a Delaware corporation with its principal executive offices at 149 Commonwealth Drive, Menlo Park, California 94025.  Corcept's shares trade on the NASDAQ Global Select Market ("NASDAQ-GS") under the ticker symbol "CORT."

15.     Defendant G. Leonard Baker ("Baker") has served as a member of the Company's Board since 1999.  Defendant Baker sold the following shares with insider information regarding

Corcept's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in Corcept stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| November 13, 2017 | 30,000 | $17.59 | $527,556 |
| May 11, 2018 | 30,000 | $16.01 | $480,312 |

16.     Defendant Belanoff is a co-founder of the Company and has served as a member of the Company's Board since 1999, as the Company's CEO since 1999, and as President since 2014. Defendant Belanoff is named as a defendant in the Securities Class Action.  Defendant Belanoff sold the following shares with insider information regarding Corcept's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in Corcept stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| December 12, 2018 | 217,115 | $19.01 | $2,381,310 |

17.     Defendant Daniel M. Bradbury ("Bradbury") has served as a director of the Company's Board since October 2016.

18.     Defendant Reneé D. Galá ("Galá") served as a director of the Company's Board between June 2016 and June 2019.  Defendant Galá served as a member of the Company's Audit Committee during the Relevant Period.

19.     Defendant David L. Mahoney ("Mahoney") has served as a member of the Company's Board since July 2004.  Defendant Mahoney served as a member of the Company's Audit Committee during the Relevant Period.  Defendant Mahoney sold the following shares with insider information regarding Corcept's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in Corcept stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| July 12, 2017 | 6,994 | $12.50 | $87,448 |
| July 18, 2017 | 23,006 | $12.50 | $287,597 |

20.     Defendant Charles Robb ("Robb") has served as the Company's Chief Financial Officer ("CFO") since September 2011.  Defendant Robb is named as a defendant in the Securities Class Action.  Defendant Robb sold the following shares with insider information regarding Corcept's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in Corcept stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| December 12, 2018 | 25,000 | $19.01 | $475,152 |

21.     Defendant Daniel N. Swisher ("Swisher") has served as a member of the Company's Board since June 2015.  Defendant Swisher served as the Chairman of the Company's Audit Committee during the Relevant Period.

22.     Defendant James N. Wilson ("Wilson") has served as a director and Chairman of the Company's Board since 1999.

23.     Defendants Baker, Belanoff, Bradbury, Galá, Mahoney, Swisher, and Wilson are collectively referred to herein as the "Director Defendants."

24.     Defendants Belanoff and Robb are collectively referred to herein as the "Officer Defendants."

25.     Defendants Swisher, Galá, and Mahoney are collectively referred to herein as the "Audit Committee Defendants.

26.     Defendants Baker, Belanoff, Mahoney, and Robb are collectively referred to herein as the "Insider Selling Defendants."

27.     Defendants Baker, Belanoff, Bradbury, Galá, Mahoney, Robb, Swisher, and Wilson are collectively referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

28.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the corporate affairs and business of the Company, the Individual Defendants owed the Company and its stockholders fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their best efforts to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

29.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

30.     In addition, as officers and/or directors of a publicly-held company, the Individual Defendants have a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock will be based on truthful and accurate information.

31.     To discharge their duties, the officers and directors of Corcept were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls

of the Company.  By virtue of such duties, the officers and directors of Corcept were required to, among other things:

a.  ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.  conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.  properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d.  remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e.  ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

32.  Each of the Individual Defendants, as an executive officer and/or director, owed to the Company and to its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

33.     The Company's Audit Committee is specifically tasked with the Board's oversight responsibilities.  The conduct of the Audit Committee is governed by the Audit Committee Charter (the "Charter").

34.     Pursuant to the Charter:

The purpose of the Audit Committee (the "Committee") of the board of directors (the "Board") of Corcept Therapeutics Incorporated (the "Company") is to oversee the accounting and financial reporting processes of the Company and audits of its financial statements.  The Committee is not responsible, however, for planning or conducting audits, or determining whether the Company's financial statements are complete and accurate or in accordance with generally accepted accounting principles.

\*       \*       \*

Committee is charged by the Board with the responsibility to:

1. Appoint and provide for the compensation of a "registered public accounting firm" (as that term is defined in Section 2(a) of the Sarbanes-Oxley Act of 2002) to serve as the Company's independent auditor, oversee the work of the independent auditor (including resolution of any disagreements between management and the independent auditor regarding financial reporting) and any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company, evaluate the performance of the independent auditor and each such other registered public accounting firm and, if so determined by the Committee, replace the independent auditor; it being acknowledged that the independent auditor is ultimately accountable to the Board and the Committee, as representatives of the stockholders.

2. Ensure the receipt of, and evaluate, the written disclosures and the letter that the independent auditor submits to the Committee regarding the auditor's independence in accordance with applicable Regulations and Nasdaq and Public Company Accounting Oversight Board requirements, discuss such reports with the auditor, oversee the independence of the independent auditor and, if so determined by the Committee in response to such reports, take appropriate action to address issues raised by such evaluation.

3. Discuss with the independent auditor the matters required to be discussed by Auditing Standards No. 1301, "Communications with Audit Committees," as it may be modified or supplemented.

4. Instruct the independent auditor and the internal auditor, if any, to advise the Committee if there are any subjects that require special attention.

5. Instruct the independent auditor to report to the Committee on all critical accounting policies of the Company, all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the auditors, and other material written communication between the auditors and management.

6. Meet with management and the independent auditor to discuss the annual financial statements and the report of the independent auditor thereon, and to discuss significant issues encountered in the course of the audit work, including: restrictions on the scope of activities; access to required information; the adequacy of internal financial controls; the adequacy of the disclosure of off-balance sheet transactions, arrangements, obligations and relationships in reports filed with the Commission; and the appropriateness of the presentation of any non-GAAP financial measures (as defined in the Regulations) included in any report filed with the Commission or in any public disclosure or release.

7. Review the management letter delivered by the independent auditor in connection with the audit.

8. Following such review and discussions, if so determined by the Committee, recommend to the Board that the annual financial statements be included in the Company's annual report.

9. Meet quarterly with management and the independent auditor to discuss the quarterly financial statements prior to the filing of the Form 10-Q; provided that this responsibility may be delegated to the chairman of the Committee or a member of the Committee who is a financial expert.

10. Meet at least once each year in separate executive sessions with management, the internal auditor, if any, and the independent auditor to discuss matters that any of them or the Committee believes could significantly affect the financial statements and should be discussed privately.

11. Review significant changes to the Company's accounting principles and practices proposed by the independent auditor, the internal auditor, if any, or management.

12. Review the scope and results of internal audits, if any.

13. Evaluate the performance of the internal auditor, if any, and, if so determined by the Committee, recommend replacement of the internal auditor.

14. Conduct or authorize such inquiries into matters within the Committee's scope of responsibility as the Committee deems appropriate.

15. Provide minutes of Committee meetings to the Board, and report to the Board on any significant matters arising from the Committee's work.

16. At least annually, review and reassess this Charter and, if appropriate, recommend changes to the Board.

17. Prepare the Committee report required by the Regulations to be included in the Company's annual proxy statement.

18. Establish a procedure for receipt, retention and treatment of any complaints received by the Company about its accounting, internal accounting controls or auditing matters and for the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

19. Approve, in accordance with Sections 10A(h) and (i) of the Exchange Act and the Regulations, all professional services (whether or not financial), to be provided to the Company by its independent auditor, provided that the Committee shall not approve any non-audit services proscribed by Section 10A(g) of the Exchange Act in the absence of an applicable exemption. The Committee may adopt policies and procedures for the approval or pre-approval of such services which may include delegation of authority to a designated member or members of the Committee to approve such services so long as any such approvals are disclosed to the full Committee at its next scheduled meeting.

20. Review and approve all related party transactions as defined by the Regulations.

21. Review and issue appropriate recommendations to the full Board with respect to any requests for waiver of the Code of Ethics submitted by the Company's senior financial officers, executive officers or directors.

35.     In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, the Audit Committee Defendants conducted little, if any, oversight of the Company's internal controls or the Company's compliance with legal and regulatory requirements resulting in materially false and misleading statements regarding the Company's business, operational, and compliance policies, and consciously disregarded their duties to monitor such controls over reporting. The Audit Committee Defendants' complete failure to perform their duties in good faith resulted in false misrepresentations to the SEC, the investing public, and the Company's stockholders.

36.     In addition, as executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including false and misleading information about acquisitions, so that the market price of the Company's common stock would be based upon truthful and accurate information.  Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing Corcept to make false and misleading statements of material fact about the Company's financials and about Corcept's maintenance of adequate internal controls.

37.     Each of the Individual Defendants further owed to Corcept and its stockholders the duty of loyalty requiring that each favor Corcept's interest and that of its stockholders over their own while conducting the affairs the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

## SUBSTANTIVE ALLEGATIONS

### BACKGROUND

38.     Corcept is a pharmaceutical company engaged in the discovery, development, and commercialization of drugs for the treatment of sever metabolic, psychiatric, and oncologic disorders.  Corcept has focused on the adverse effects of excess cortisol, studying new compounds that may mitigate those effects.

39.     Corcept was founded in May 1998 by Belanoff and another Silicon Valley biotech investors, Alan Schatzberg ("Schatzberg"), a psychiatrist whose entanglements with the

pharmaceutical industry came under close scrutiny around the time Corcept was in the research and development phase for the entirety of its product portfolio. Specifically, in June 2008, U.S. Senator Chuck Grassley, then the ranking Republican on the Senate Finance Committee, criticized Corcept and Schatzberg, then chair of the psychiatry department at Stanford University School of Medicine, for not being forthcoming about the value of his shares in Corcept. According to Grassley, Schatzberg had reported stock holdings in Corcept worth "over $100,000," when, in fact, Schatzberg's stake exceeded $6 million.

40.     For the first 15 years of its existence, Corcept was focused on researching, developing, and eventually seeking regulatory approval for products designed to treat Cushing's Syndrom and other cortisol-related illnesses.

41.     In 2012, Corcept launched the prescription medicine Korlym, a cortisol receptor blocker to control hyperglycemia (high blood sugar) in adult patients with endogenous Cushing's syndrome who have type 2 diabetes or glucose intolerance and have failed surgery or are not candidates for surgery.

42.     Korlym was the first FDA-approved oral therapy for the treatment of such patients. Since Korlym was an orphan drug—*i.e.*, one developed specifically to treat a rare medical condition—Corcept received seven years of exclusive marketing rights, as well as tax credits for clinical trial costs, marketing application filing fee waivers, and assistance from the FDA in the drug development process.

43.     During the Relevant Period, Korlym was Corcept's only commercialized product. Moreover, while other products are in development, Korlym remains the Company's only revenue-generating product.

44.     According to its 2018 Form 10-K, filed with the SEC on February 26, 2019, the Company and its management and Board are acutely aware of the central role Korlym plays in Corcept's immediate and long-term success:

> **Failure to generate sufficient revenue from the sale of Korlym would harm our financial results and would likely cause our stock price to decline.**
>
> Our ability to generate revenue and fund our commercial operations and development programs is entirely dependent on the sale of Korlym to treat patients with Cushing's syndrome. Physicians will prescribe Korlym only if they determine that it is preferable to other treatments, even if those treatments are not approved for Cushing's syndrome. Because Cushing's syndrome is rare, most physicians are inexperienced diagnosing or caring for patients with the illness and it may be difficult to persuade them to identify appropriate patients and prescribe Korlym.

**THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO ISSUE MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD**

45.     On August 2, 2017, the Company filed its quarterly report with the SEC for the period ended on June 30, 2017, in which it reported $35.56 million in revenue and $12.65 million in net income.  In the report, the Individual Defendants did not mention whether the Company had improperly promoted Korlym or whether the Company was deriving virtually all of its revenue through a related party.

46.     On November 2, 2017, the Company filed its quarterly report with the SEC for the period ended on September 30, 2017, in which it reported $42.76 million in revenue and $13.58 million in net income.  In the report, the Individual Defendants did not mention whether the Company had improperly promoted Korlym or whether the Company was deriving virtually all of its revenue through a related party.

47.     On February 28, 2018, the Company filed its annual report with the SEC for the period ended on December 31, 2017 (the "2017 10-K"), in which it reported $159.2 million in revenue and $129.12 million in net income.

48.     In the 2017 10-K, the Company warned that it may be subject to civil or criminal penalties if it violated various laws and regulations in connection with the marketing efforts of Korlym.  The Company stated, in relevant part:

> In the United States, we are subject to FDA regulations governing the promotion and sale of medications.  Although physicians are permitted to prescribe drugs for indications other than those approved by the FDA, manufacturers are prohibited from promoting products for such "off-label" uses.  In the United States, we market Korlym for treatment of hyperglycemia secondary to hypercortisolism in adult patients with endogenous Cushing's syndrome who have type 2 diabetes mellitus or glucose intolerance and have failed surgery or are not candidates for surgery and provide promotional materials and training programs to physicians regarding the use of Korlym for this indication.  Although we believe our marketing materials and training programs for physicians do not constitute "off-label" promotion of Korlym, the FDA may disagree.  If the FDA determines that our promotional materials, training or other activities by our employees or agents constitute "offlabel" promotion of Korlym, it could ask us to change our training or promotional materials or other activities.  The FDA could also subject us to regulatory enforcement actions, including issuance of a public "warning letter," injunction, seizure, civil fine or criminal penalties.  Other federal or state enforcement authorities might act if they believe that the alleged improper promotion led to the submission and payment of claims for an unapproved use, which could result in significant fines or penalties under other statutory authorities, such as laws prohibiting false claims for reimbursement.  Even if it is determined that we are not in violation of these laws, we may be faced with negative publicity, incur significant expenses and be forced to devote management time to defending our position.

49.     The 2017 10-K also disclosed that only one specialty pharmacy, Optime Care, Inc., ("Optime Care") represented approximately 99% of the Company's revenue.

50.     In the 2017 10-K, the Individual Defendants did not mention whether the Company had improperly promoted Korlym or whether Optime was a related party.

51.     On May 9, 2018, the Company filed its quarterly report for the period ended on March 31, 2018, in which it reported $57.66 million in revenue and $17.46 million in net income. In the report, the Individual Defendants did not mention whether the Company had improperly promoted Korlym or whether Optime was a related party.

52.     On August 9, 2018, the Company filed its quarterly report for the period ended on June 30, 2018, in which it reported $62.31 million in revenue and $18.20 million in net income. In the report, the Individual Defendants did not mention whether the Company had improperly promoted Korlym or whether Optime was a related party.

53.     On November 2, 2018, the Company filed its quarterly report for the period ended on September 30, 2018, in which it reported $64.45 million in revenue and $17.75 million in net income. In the report, the Individual Defendants did not mention whether the Company had improperly promoted Korlym or whether Optime was a related party.

54.     The above statements identified in ¶¶ 45-53 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.

55.     Specifically, the Individual Defendants failed to disclose to investors that:  (1) the Company had improperly paid doctors to promote Korlym; (2) the Company aggressively promoted Korlym for off-label uses; (3) the Company's sole specialty pharmacy that was responsible for 99% of the Company's revenue was a related party; (4) the Company artificially inflated its revenue and sales using illicit sales practices through a related party; (5) such practices are reasonably likely to lead to regulatory scrutiny; and (6) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**THE TRUTH IS REVEALED**

56.     On January 25, 2019, the Southern Investigative Reporting Foundation ("SIRF") published a report alleging that Corcept improperly paid doctors to prescribe Korlym for off-label uses.  In its report, SIRF stated:

Another thing that stands out in the list of high-volume Korlym prescribers is their peculiar geographic clustering.  Cushing's syndrome is a rare disease.  The FDA has estimated that the number of people in the United States who could be prescribed this drug is 5,000.  So some medical experts might be surprised to see Korlym prescribers found mainly in small towns and modest-sized cities, many at a substantial distance from established medical research centers.  (For example, Dr. John C. Parker, a Wilmington, North Carolina–based endocrinologist, wrote at least 41 Korlym prescriptions in 2016.  But one would have expected instead that some larger-volume prescribers would be located, say, in the state's heavier populated Durham and Chapel Hill area, where two pituitary disorder clinics are affiliated with prominent university hospitals.  Wilmington, though, is about 2.5 hours by car from these clinics.)

Could these doctors based in smaller communities with a limited pool of patients to draw from be prescribing Corcept to patients merely with diabetes — instead of endogenous Cushing's syndrome?

When Corcept's CFO Robb was asked during the late December interview if his company was using its speakers bureau program to encourage doctors to prescribe the drug for off-label uses, he said the company was doing no such thing.  He argued that the FDA's estimate of 5,000 U.S. patients who could potentially take the drug was somewhat arbitrary and nearly seven years old.  He said that a better figure, based on research by Corcept and Novartis, is closer to 20,000.  (Novartis is in the late stages of testing its own Cushing's syndrome drug.)

In addition, Robb said that as awareness of Korlym grows, doctors will realize that more of their patients have Cushing's syndrome, and the clustering of Korlym prescribers in smaller communities happened only because one group of physicians recognized earlier than their colleagues how the disease could be treated.

Pressed on the unusual odds of so many prescriptions for a treatment of such a rare disease from doctors in Zanesville, Ohio and Murfreesboro, Tennessee, Robb declared that "over 90 percent" of all Korlym prescriptions were "on label."  He added that "since it's an expensive drug," nearly all commercial insurers have an extensive preapproval process before paying for the drug.

57.    SIRF alleged that the Company was using its speakers bureau program to pay

doctors for prescribing Korlym, stating:

Medicare Part D and the Department of Veteran Affairs records are the only two sources for the general public to search for details about who prescribes Korlym. People who rely on private insurers place their orders through a single specialty pharmacy, whose sales are not reported to prescription-monitoring services. According to Medicare Part D payment records, 44 doctors each wrote at least 11

Korlym prescriptions in 2016. (The Centers for Medicare & Medicaid Services doesn't release the names of doctors writing 10 or fewer prescriptions.)

Eleven of the 15 doctors who are the most frequent prescribers of Korlym to Medicare Part D enrollees received at least $7,500 in speakers bureau payments from Corcept in 2016 and 2017 combined.

58.     On this news, the Company shares fell 11% to close at $12.29 per share on January 25, 2019.

59.     On February 5, 2019, Blue Orca Capital ("Blue Orca") released an investigative piece that revealed that Corcept's "sole specialty pharmacy and exclusive distributor is an undisclosed related party" called Optime. Blue Orca warned that Corcept's relationship with Optime posed "a material risk that the Company is using its captured pharmacy to boost sales, hide losses, or engage in other financial shenanigans." The article stated, in relevant part:

> The growth rate in Corcept revenues, driven exclusively by Korlym prescriptions, accelerated significantly in Q3 and Q4 2017, immediately following the switch from [Dohmen Life Science Services ("Dohmen")] to Optime, which formally took place in August 2017.
>
> *     *     *
>
> Corcept is financially incentivizing physicians with direct payments to prescribe Korlym beyond the narrow set of circumstances for which the drug was approved and in which the drug is appropriate. This is extremely costly to the health care system, in part because Corcept has raised prices on Korlym since FDA approval. Yet pay-for-play with physicians is only half the thesis, because such prescriptions have to clear an increasingly high bar set by PBMs and payers.
>
> That is why the specialty pharmacy is so important. A specialty pharmacy like Dohmen with hundreds of clients and a large book of business would have no incentive to push Korlym through the approval process in situations where the drug would not be appropriate or merited. But the same cannot be said of Optime, whose first and we think only major client is Corcept and thus has direct financial incentive to match the Company's aggressive tactics. Notably, right before Corcept switched from Dohmen to Optime, the Company increased guidance substantially.
>
> *     *     *

Optime is supposed to be an independent third-party pharmacy, yet when we called Optime and asked for Corcept, an Optime representative told us that Optime and Corcept were one and the same.

## THE INDIVIDUAL DEFENDANTS ISSUED A MATERIALLY FALSE AND MISLEADING PROXY STATEMENT DURING THE RELEVANT PERIOD.

60.    In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants also caused the Company to issue a false and misleading proxy statement during the Relevant Period.  Specifically, the Company's 2018 Proxy sought stockholder votes to, among others, elect the Director Defendants nominated by the Company's Board of Directors to serve on the Board for a year.

61.    The Director Defendants drafted, approved, reviewed, and/or signed the 2018 Proxy before it was filed with the SEC and disseminated to Corcept's shareholders.  The Director Defendants negligently issued materially misleading statements in the 2018 Proxy.  These 2018 Proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the 2018 Proxy allegations and related claims.

62.    In support of the Individual Defendants' bid to reelect the Director Defendants, the Individual Defendants included in the Proxy a summary of the Director Defendants' purported qualifications for reelection to the Board, including:

In addition to the information presented below regarding the qualities that led our Board to conclude that they should serve as directors, our director nominees have a reputation for integrity, honesty and adherence to high ethical standards and have demonstrated business acumen, sound judgment and a commitment to serve our company and the Board. Our Board believes that the backgrounds and qualifications of these nominees, considered as a group, exhibit a combination of experience, knowledge and talent that will allow them to fulfill their responsibilities as Board members.

63.     The Individual Defendants further highlighted their supposed oversight of the Company.  In particular, the 2018 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that Corcept faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans.  The 2018 Proxy stated:

*Risk Oversight.*  The Board oversees our risk exposures and risk management and the steps management has undertaken to control business and financial risks.  The Board reviews our strategic plan at least annually and assesses the risks facing our company.  While the Board has ultimate responsibility for the Company's risk management process, various committees of the Board also have responsibility for risk management.  Our Audit Committee oversees management of risks relating to accounting matters, financial reporting and SEC compliance.  Our Compensation Committee oversees the management of risks relating to executive compensation.  In addition, in setting compensation, the Compensation Committee strives to create incentives that discourage risk-taking that is inconsistent with our business strategy.  Our Corporate Governance and Nominating Committee oversees management of risks associated with maintaining independence of our Board and preventing conflicts of interest.  Each committee regularly reports to the full Board.

64.     In addition, as to the Audit Committee, the 2018 Proxy stated:

Under the guidance of a written charter adopted by the Board, the purpose of the Audit Committee is to oversee the accounting and financial reporting processes of the Company and audits of its financial statements.  The responsibilities of the Audit Committee include appointing and providing for the compensation of the Company's independent registered public accounting firm.  Each of the members of the Audit Committee meets the independence requirements of NASDAQ and the SEC.

Management has primary responsibility for the system of internal controls and the financial reporting process.  The independent registered public accounting firm has the responsibility to express an opinion on the financial statements and internal control over financial reporting based on an audit conducted in accordance with the standards of the Public Company Accounting Oversight Board (PCAOB).

In this context and in connection with the audited financial statements contained in the Company's Annual Report on Form 10-K, the Audit Committee:

- reviewed and discussed the audited financial statements as of and for the fiscal year ended December 31, 2017 with the Company's management and Ernst & Young LLP, the Company's independent registered public

accounting firm;

- discussed with Ernst & Young LLP the matters required to be discussed by Auditing Standard No. 1301 "Communications with Audit Committees" as adopted by the PCAOB;

- received the written disclosures and the letter from Ernst & Young LLP required by applicable requirements of the PCAOB regarding Ernst & Young LLP's communications with the Audit Committee concerning independence and discussed with Ernst & Young LLP their independence;

- considered and discussed whether the non-audit services, if any, performed by Ernst & Young LLP are compatible with maintaining their independence;

- reviewed and discussed the reports of management and Ernst & Young LLP on their assessments of the effectiveness of the Company's internal control over financial reporting as of the end of the most recent fiscal year;

- reviewed the disclosures regarding the Company's system of internal controls required to be contained in the Company's Form 10-K;

- based on the foregoing reviews and discussions, recommended to the Board that the audited financial statements and management's report on the effectiveness of the Company's internal control over financial reporting as of December 31, 2017 be included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2017 filed with the Securities and Exchange Commission; and

- instructed Ernst & Young LLP that the Audit Committee expects to be advised if there are any subjects that require special attention.

The Audit Committee has also recommended, subject to stockholder ratification in Proposal 2 in this Proxy Statement, the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2018.

65.     With specific reference to certain Individual Defendants, the Proxy also touted certain Director Defendants' knowledge of the Company's own operations and expertise in different areas, as if to suggest that they were ideally situated and suited to oversee and direct Corcept's business:

- "Dr. Belanoff brings to our Board a deep knowledge of our financial activities, commercial operations and our research and development programs."

- "Mr. Baker brings to our Board extensive experience in advising companies about finance, strategic transactions and operations."

- "Mr. Bradbury brings to our Board extensive experience in pharmaceutical industry strategy, operations and management."

- "Ms. Galá brings to our Board extensive experience in pharmaceutical industry sales, finance, corporate strategy and business development."

- "Mr. Mahoney brings to our Board extensive experience in pharmaceutical management, operating strategy and logistics."

- "Mr. Swisher brings to our Board experience in life science industry sales, operations and finance."

66.     The 2018 Proxy, thus, assured stockholders that both the Individual Defendants and the Board was involved with Corcept's business strategy, actively monitored the Company's risks and exposures, following good corporate governance practices and acting in an ethical and legal manner.

67.     In reality, the Individual Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Individual Defendants from disclosing: (1) the Company had improperly paid doctors to promote Korlym; (2) the Company aggressively promoted Korlym for off-label uses; (3) the Company's sole specialty pharmacy that was responsible for 99% of the Company's revenue was a related party; (4) the Company artificially inflated its revenue and sales using illicit sales practices through a related party; (5) such practices are reasonably likely to lead to regulatory scrutiny; and (6) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

68.     As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect the Director Defendants.

**THE INDIVIDUAL DEFENDANTS SOLD SUBSTANTIAL SHARES OF CORCEPT STOCK WHILE IN POSSESSION OF MATERIAL, ADVERSE INFORMATION REGARDING THE COMPANY'S BUSINESS.**

69.     During the Relevant Period, certain of the Individual Defendants—specifically, the Insider Selling Defendants—engaged in numerous sales of Corcept common stock while in possession of material information that was adverse to Corcept's business.

70.     In particular, defendants Baker, Belanoff, and Mahoney engaged in the following stock sales during the Relevant Period:

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Mahoney | July 12, 2017 | 6,994 | $12.50 | $87,448 |
| Mahoney | July 18, 2017 | 23,006 | $12.50 | $287,597 |
| Baker | November 13, 2017 | 30,000 | $17.59 | $527,556 |
| Baker | May 11, 2018 | 30,000 | $16.01 | $480,312 |
| Belanoff | December 12, 2018 | 217,115 | $19.01 | $2,381,310 |
| | | | TOTAL | $3,764,223 |

71.     In making these trades, the Insider Selling Defendants were able to unjustly profit from artificially high trading levels stemming from the Individual Defendants' concerted false and misleading statements disseminated to the market.

## DAMAGES TO THE COMPANY

72.     As a result of the Individual Defendants' wrongful conduct, Corcept disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated Corcept's credibility.  Corcept has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

73.     Moreover, the actions of the Individual Defendants in directing Corcept to undertake illicit sales practices have exposed Corcept to civil and criminal liability and are not protected by the business judgment rule.

74.     Furthermore, aside from ruining the Company's reputation for honesty, integrity, and aptitude, the Individual Defendants have exposed the Company to very expensive legal costs to defend, investigate, and pay judgment or settlement in the Securities Class Action in addition to potential fines from the U.S. regulators regarding the Company's illicit sales practices.

75.     As a direct and proximate result of the Individual Defendants' actions as alleged above, Corcept's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

76.     Moreover, these actions have irreparably damaged Corcept's corporate image and goodwill.  For at least the foreseeable future, Corcept will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Corcept's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

77.     Plaintiff incorporates the allegations herein by reference.

78.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of the law.

79.     Plaintiff is a stockholder of Corcept, was a stockholder of Corcept at the time of the wrongdoing alleged herein, and has been a stockholder of Corcept continuously since that time.

80.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

81.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Corcept Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

82.     At the time of the filing of this complaint, the Corcept Board consists of the following six individuals:  Defendants Wilson, Belanoff, Baker, Bradbury, Mahoney, and Swisher.

83.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Corcept Board to institute this action against the Individual Defendants.  Such a demand would have been a futile and useless act with respect to each and every one of the current Board members because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**DEMAND IS FUTILE AS TO ALL CURRENT MEMBERS OF THE BOARD BECAUSE THEY EACH FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

84.     The current members of the Board all face a substantial likelihood of liability for their individual misconduct.  The current members of the Board were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

85.     Moreover, as directors, the current members of the Board owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being

implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and/or with reckless disregard allowed Corcept to partake in illicit sales practices and reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

86.     The Director Defendants knowingly and/or recklessly allowed Corcept to partake in illicit sales practices, made or authorized false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence.  These actions constitute breaches of the fiduciary duties of loyalty and good faith, for which the Individual Defendants face a substantial likelihood of liability.  If the current members of the Board were to bring a suit on behalf of Corcept to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile as to the Director Defendants.

**DEMAND IS EXCUSED AS TO DEFENDANTS BELANOFF, BAKER, AND MAHONEY BECAUSE THEY FINANCIALLY BENEFITED FROM THE FALSE AND MISLEADING STATEMENTS**

87.     As noted above, defendants Belanoff, Baker, and Mahoney personally benefited from Corcept's illicit sales practices and the materially false and misleading statements made by the Individual Defendants by having an opportunity to sell shares of Corcept stock at artificially inflated prices, a benefit not shared by Corcept's public stockholders.  Accordingly, demand is futile as to defendants Belanoff, Baker, and Mahoney.

**DEFENDANT BELANOFF IS INTERESTED AND LACKS INDEPENDENCE**

88.     Defendant Belanoff is not disinterested for purposes of demand futility because his principal occupation is serving as Corcept's President and CEO.  As such, the 2018 Proxy filed with the SEC explicitly states that Belanoff is not independent.  Further, according to the Company's SEC filings, in 2017 and 2018, Belanoff received total compensation of $4,271,452 and $6,314,617, respectively.  This amount is material to him.

89.     Further, Belanoff is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.

**DEMAND IS EXCUSED AS TO DEFENDANTS SWISHER AND MAHONEY BECAUSE AS MEMBERS OF THE AUDIT COMMITTEE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

90.     As members of the Audit Committee during the Relevant Period, defendants Swisher and Mahoney participated in and knowingly approved Corcept's illicit sales practices and filing of false financial statements and allowed the Individual Defendants to repeatedly make other false and misleading statements to the investing public.  More specifically, as members of the Audit Committee, defendants Swisher and Mahoney were obligated to oversee and monitor the integrity of the Company's financial statements and the Company's compliance with legal and regulatory requirements.  Instead, defendants Swisher and Mahoney, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and compliance with legal and regulatory requirements, as required by the Audit Committee Charter. For this reason, demand is futile as to defendants Swisher and Mahoney.

**COUNT I**
**BREACH OF FIDUCIARY DUTY**
**(Against the Individual Defendants)**

91.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

92.     Each of the Individual Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Corcept's business and affairs.

93.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

94.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein.   The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Corcept.

95.     In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

96.     The Individual Defendants also breached their fiduciary duties by causing the Company to engage in the illicit sales practices in violation of U.S. law.

97.     In addition, the Individual Defendants further breached their fiduciary duties owed to Corcept by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that:  (1) the Company had improperly paid doctors to promote Korlym; (2) the Company aggressively promoted Korlym for off-label uses; (3) the Company's sole specialty pharmacy that was responsible for 99% of the Company's revenue was a related party; (4) the Company artificially inflated its revenue and sales using illicit sales practices through a related party; (5) such practices

are reasonably likely to lead to regulatory scrutiny; and (6) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

98.     The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

99.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales.  The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

100.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

101.    As a direct and proximate result of the Individual Defendants' breaches of their

fiduciary obligations, Corcept has sustained and continues to sustain significant damages.  As a

result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

102.    Plaintiff on behalf of Corcept has no adequate remedy at law.

### COUNT II
### VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT
**(Against the Individual Defendants)**

103.    Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

104.    The section 14(a) Exchange Act claims alleged herein are based solely on

negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf

of the Individual Defendants.  The section 14(a) Exchange Act claims detailed herein do not allege

and do not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any

allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the

nonfraud claims.

105.    The Individual Defendants negligently issued, caused to be issued, and participated

in the issuance of materially misleading written statements to stockholders which were contained

in the 2018 Proxy.  In the 2018 Proxy, the Board solicited stockholder votes to reelect the Director

Defendants to the Board.

106.    The 2018 Proxy, however, misrepresented and failed to disclose, among others, the

Board's risk oversight and the Company's inadequate internal controls which facilitated the illegal

behavior described herein.  By reasons of the conduct alleged herein, the Individual Defendants

violated section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants'

wrongful conduct, Corcept misled and deceived its stockholders by making materially misleading

statements that were essential links in stockholders following the Company's recommendation and voting to reelect the Director Defendants the Board.

107.     Plaintiff, on behalf of Corcept, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2018 Proxy in connection with the improper reelection of the Director Defendants to the Board.

## COUNT III
### INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION
### (Against the Insider Selling Defendants)

108.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

109.     At the time each of the Insider Selling Defendants sold his or her Corcept stock, he or she knew the material, non-public information described above, and sold Corcept stock on the basis of such information.

110.     The information described above was proprietary, non-public information concerning the Company's business operations, financial condition, and growth prospects.  It was a proprietary asset belonging to the Company, which each of the Insider Selling Defendants misappropriated to his or her own benefit when he or she sold personal holdings in Corcept stock. Each of the Insider Selling Defendants knew that this information was not intended to be available to the public.  Had such information been generally available to the public, it would have significantly reduced the market price of Corcept stock.

111.     The Insider Selling Defendants' sale of stock while in possession and control of this material, adverse, non-public information was a breach of his or her fiduciary duties of loyalty and good faith.  Each of the Insider Selling Defendants is therefore liable to Corcept for insider trading.

112.    Since the use of the Company's proprietary information for personal gain constituted a breach of the fiduciary duties of the Insider Selling Defendants, the Company is entitled to the imposition of a constructive trust on any profits such Insider Selling Defendants obtained thereby.

113.    Plaintiff, on behalf of Corcept, has no adequate remedy at law.

### COUNT IV
### WASTE OF CORPORATE ASSETS
### (Against Individual Defendants)

114.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

115.    As a noted above, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

116.    As a result of this waste of corporate assets, the Company has been damaged and the Individual Defendants are each liable to the Company.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Declaring that Plaintiff may maintain this derivative action on behalf of Corcept and that Plaintiff is a proper and adequate representative of the Company;

B.      Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.      Ordering the Insider Selling Defendants to disgorge the profits obtained as a result of their sale of Corcept stock while in possession of insider information as described herein;

D.      Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 30, 2019                              Respectfully Submitted,

                                                      /s/ Blake A. Bennett
                                                      **COOCH AND TAYLOR, P.A.**
                                                      Blake A. Bennett (#5133)
                                                      1007 N. Orange St., Suite 1120
                                                      Wilmington, DE 19801
                                                      Telephone: (302) 984-3800
                                                      Email: bbennett@coochtaylor.com

                                                      *Attorney for Plaintiff*


**OF COUNSEL**

**BRAGAR EAGEL & SQUIRE, P.C.**
W. Scott Holleman
Marion C. Passmore
Garam Choe
Alexandra B. Raymond
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone: (646) 860-9449

*Attorneys for Plaintiff*